FILED
AUG 4, 2015
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 32998-4-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ELIZABETH MULLIGAN, | ) | |
| | ) | |
| Appellant. | ) | |

LAWRENCE-BERREY, J. — A jury convicted Elizabeth Mulligan of one count of

third degree assault and two counts of fourth degree assault in relation to an incident that

occurred inside and outside of a tavern in Tacoma, Washington. On appeal, Ms. Mulligan

contends that her statements made to police after *Miranda*[1] warnings should be

suppressed and that there was insufficient evidence to disprove that she was acting in

self-defense on one of the two fourth degree assault charges. We disagree and affirm.

FACTS

_____

[1] *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

On the evening of March 11, 2013, Tami Kenan was working her shift as a bartender at the Flying Boots tavern in Tacoma. Shortly before midnight, three couples dressed in formal wear entered the tavern. Ms. Kenan recognized one of the couples as Robert and Elizabeth Mulligan, who had visited the tavern a few days earlier. The group sat down in a booth and ordered drinks. Everyone seemed in good spirits. Eventually, one of the couples left, and the Mulligans and David and Angela Anderson stayed.

Shortly thereafter, Ms. Kenan overheard the two couples arguing. Mr. Anderson accused his wife of flirting with Mr. Mulligan. The argument escalated as Mr. Anderson attempted to physically drag Ms. Anderson out of the tavern. In defense of Ms. Anderson, Ms. Mulligan yelled at Mr. Anderson. In an attempt to defuse the situation, Ms. Kenan approached the couples and asked Mr. Anderson to come with her to another part of the tavern. As they walked away, Ms. Mulligan followed and told Ms. Kenan that Mr. Anderson was abusive toward Ms. Anderson. Then, Mr. Mulligan joined in Ms. Mulligan's argument with Mr. Anderson. A physical fight began between the three individuals and ended when Mr. Anderson ran out of the tavern followed by Ms. Anderson.

After the Andersons left the tavern, Ms. Mulligan went to the tavern's 10-foot plate glass window, pounded on it with her fists, and shouted at the Andersons, who were

standing outside. Ms. Kenan repeatedly asked Ms. Mulligan to stop because Ms. Kenan was concerned that Ms. Mulligan might break the window and hurt herself. Ms. Mulligan ignored Ms. Kenan. Ms. Kenan saw that the window was bowing, grabbed Ms. Mulligan from behind, and pulled her away from the window.

Ms. Kenan tried to explain that she was just trying to get Ms. Mulligan away from the window, but Ms. Mulligan was angry and screamed that Ms. Kenan was trying to choke her. Ms. Kenan let go of Ms. Mulligan. Ms. Mulligan turned around, looked at Ms. Kenan, and punched her in the face. Mr. Mulligan approached, yelled obscenities at Ms. Kenan, and then ran outside with Ms. Mulligan. The Mulligans began chasing Mr. Anderson. Ms. Kenan asked for someone in the bar to call the police.

Ms. Kenan looked out the window and noticed Ms. Mulligan sprawled on the ground. Ms. Kenan went outside to make sure that Ms. Mulligan was not hurt. When she tried to help Ms. Mulligan to her feet, Ms. Mulligan punched Ms. Kenan again. Ms. Kenan went back into the tavern. The police arrived shortly thereafter.

Responding officers found the Mulligans and the Andersons gathered across the street from the tavern. Ms. Mulligan was sitting on a curb yelling incoherently. The responding officers could see that Ms. Mulligan was highly intoxicated.

Tacoma Police Officer Steven Butts was one of the first officers to arrive. Officer Butts approached Mr. Anderson, who was talking to another officer, to find out what was going on. Ms. Mulligan stood up, walked directly to Officer Butts, made an angry growling sound, and punched him in the face. The blow knocked Officer Butts' glasses off his face.

Officer Butts grabbed Ms. Mulligan by the arm and tried to spin her around in an attempt to keep her from hitting him again. As he was doing so, Mr. Mulligan grabbed Officer Butts from behind and tried to pull him away from Ms. Mulligan. As other officers attempted to restrain Mr. Mulligan, Officer Butts and another officer worked to restrain Ms. Mulligan. In the process, Ms. Mulligan ripped Officer Butts's police radio from his uniform. Officer Butts had to forcefully remove the radio from Ms. Mulligan.

Ms. Mulligan scratched and pinched Officer Butts as he put her in handcuffs. She also attempted to kick the surrounding officers and continued to swear. As Ms. Mulligan sat on the ground, she yelled, "Lawyer! Lawyer!" repeatedly for about two minutes. 2 Report of Proceedings (RP) at 181. She then banged her head against the cement two or three times, causing her forehead to bleed. Officers had to hold Ms. Mulligan down to prevent her from further injury. Medical responders treated Ms. Mulligan at the scene

and then transported her to the hospital. The medic noticed that Ms. Mulligan exhibited a high level of intoxication and classified her as having an altered level of consciousness.

Officer Butts accompanied Ms. Mulligan to the hospital. About 1 hour and 45 minutes had passed from when Officer Butts first arrived at the tavern. Ms. Mulligan was no longer yelling, and her demeanor was calm. Officer Butts read *Miranda* rights to her and asked if she was willing to answer questions. She agreed.

Ms. Mulligan told Officer Butts that she was upset at the bartender for kicking her group out and did not understand why they had been asked to leave. She admitted to trying to hit Ms. Kenan but did not remember hitting Officer Butts. She also admitted to being belligerent, drunk, and loud.

The State charged Ms. Mulligan with one count of third degree assault of Officer Butts, one count of fourth degree assault of Ms. Kenan while inside the tavern, one count of second degree robbery, one count of first degree theft for taking the police radio, and one count of first degree burglary for the assault of Ms. Kenan outside the tavern. The State also charged Mr. Mulligan with several offenses.

Prior to trial, Ms. Mulligan filed a *Knapstad*[2] motion as to the robbery, theft, and burglary charges. The trial court granted the motion in part, dismissing the robbery and

---

[2] *State v. Knapstad*, 107 Wn.2d 346, 729 P.2d 48 (1986).

theft charges but allowing the burglary charges to proceed to trial. The State then amended the information and added a second charge of fourth degree assault in place of the first degree burglary charge committed against Ms. Kenan outside the tavern.

Also, a CrR 3.5 hearing was held to determine the admissibility of Ms. Mulligan's statements to Officer Butts. In its oral ruling, the court determined that Ms. Mulligan did not unequivocally request an attorney before being questioned by police. The court also entered written findings. The court found that Ms. Mulligan's yelling of "Lawyer! Lawyer!" for two straight minutes was spontaneous and that while she was in custody at the time, the statement was not made in response to any questioning. As for the admissions Ms. Mulligan made while at the hospital, regarding hitting Ms. Kenan and Officer Butts, the court found that the statements were made after Ms. Mulligan was fully advised of her rights and after she acknowledged an understanding of those rights. The court also found that while Ms. Mulligan appeared to be intoxicated, she was appropriately responsive to questioning and appeared to understand; she made the statements voluntarily, intelligently, and knowingly. The court determined that all of the statements were admissible.

A jury trial was held. On the second day of trial, Ms. Mulligan asked the court to allow her to argue self-defense in regard to the assault committed against Ms. Kenan inside the tavern. The trial court allowed Ms. Mulligan to present the affirmative defense. The jury found Ms. Mulligan guilty of third degree assault against the officer and both counts of fourth degree assault against Ms. Kenan.

Ms. Mulligan appeals. She contends that the trial court erred when it concluded that she did not make an unequivocal request for an attorney outside of the tavern. She challenges the conviction for fourth degree assault against the bartender inside the tavern, contending that the State failed to prove beyond a reasonable doubt that she was not acting in self-defense.

## ANALYSIS

A.    *Whether Ms. Mulligan's post-Miranda statements were admissible*

We review a trial court's challenged findings of fact from a CrR 3.5 suppression hearing for substantial evidence. *State v. Grogan*, 147 Wn. App. 511, 516, 195 P.3d 1017 (2008), *adhered to on remand*, 158 Wn. App. 272, 246 P.3d 196 (2010). "'Substantial evidence is evidence sufficient to persuade a fair-minded, rational person of the truth of the finding.'" *Id.* (internal quotation marks omitted) (quoting *State v. Solomon*, 114 Wn.

No. 32998-4-III
*State v. Mulligan*

App. 781, 789, 60 P.3d 1215 (2002)). We apply de novo review to the court's challenged

conclusions of law that are derived from the findings of fact. *Id.*

The right to counsel is based on the Fifth Amendment and the Sixth Amendment to

the United States Constitution. *State v. Templeton*, 148 Wn.2d 193, 207, 59 P.3d 632

(2002). Under the Fifth Amendment, the right to counsel is ancillary to the privilege

against self-incrimination during custodial interrogation. "The Fifth Amendment right to

counsel exists solely to guard against coercive, and therefore unreliable, confessions

obtained during in-custody interrogation." *State v. Stewart*, 113 Wn.2d 462, 478, 780

P.2d 844 (1989). The court fashioned a practical rule in *Miranda*, 384 U.S. 436, to

ensure the integrity of the Fifth Amendment and to define the safeguards effective to

secure the privilege against self-incrimination, including advising the accused of his or

her right to counsel. *Stewart*, 113 Wn.2d at 465-66. Custodial interrogation must be

preceded by advice to the accused that they have the right to remain silent and the right to

the presence of an attorney. *Miranda*, 384 U.S. at 479. "A suspect's Fifth Amendment

privilege against self-incrimination and the corresponding right to be informed attaches

when 'custodial interrogation' begins." *Templeton*, 148 Wn.2d at 208.

The Sixth Amendment provides an accused the right to counsel at any critical stage

of a criminal prosecution. The Washington Criminal Rules expand this right by

8

guaranteeing the right to counsel "as soon as feasible after the defendant is taken into custody, appears before a committing magistrate, or is formally charged, whichever occurs earliest." CrR 3.1(b)(1); *Heinemann v. Whitman County*, 105 Wn.2d 796, 803, 718 P.2d 789 (1986).

"When a person is taken into custody that person shall immediately be advised of the right to a lawyer. Such advice shall be made in words easily understood, and it shall be stated expressly that a person who is unable to pay a lawyer is entitled to have one provided without charge." CrR 3.1(c)(1). *Miranda* warnings are sufficient to advise a defendant of his or her right to counsel under the Fifth Amendment and CrR 3.1(c)(1) if given as soon as a defendant is taken into custody and if the warnings adequately convey to a defendant the right to contact counsel at any time. *See Templeton*, 148 Wn.2d at 218-20.[3]

A person in custody who wants a lawyer shall, at the earliest opportunity, "be provided access to a telephone, the telephone number of the public defender or official responsible for assigning a lawyer, and any other means necessary to place the person in

---

[3] Timing requirements differ between *Miranda* warnings and the CrR 3.1 right to counsel. Law enforcement is required to inform a defendant of the right to counsel under CrR 3.1(b) as soon as a person is taken into custody, when he or she appears before a committing magistrate, or when he or she is formally charged, whichever occurs earliest. CrR 3.1(b)(1). In comparison, *Miranda* warnings are required when police begin

communication with a lawyer." CrR 3.1(c)(2). The opportunity to contact counsel under

CrR 3.1(c)(2) is activated only after the accused requests an attorney. *State v.*

*Kirkpatrick*, 89 Wn. App. 407, 413 n.2, 948 P.2d 882 (1997). CrR 3.1(c)(2) goes further

than simply informing a defendant of the right to counsel under *Miranda*. *Id.* at 413. The

rule provides a meaningful opportunity for a defendant to actually contact an attorney. *Id.*

Once requested, law enforcement must make reasonable efforts to connect the accused

with an attorney. *Id.* at 414.

Providing the right to contact an attorney at the earliest opportunity does not

always mean that law enforcement must allow a defendant to contact an attorney

immediately upon request. *State v. Mullins*, 158 Wn. App. 360, 370, 241 P.3d 456

(2010). In some circumstances, like during prebooking procedures, the earliest

opportunity may arise sometime after the request is made. *Id.*

A defendant's request for an attorney must be unequivocal. *State v. Piatnitsky*,

170 Wn. App. 195, 213, 282 P.3d 1184 (2012), *aff'd*, 180 Wn.2d 407, 325 P.3d 167

(2014), *cert. denied*, 135 S. Ct. 950 (2015). To be unequivocal, the defendant must

sufficiently and clearly articulate his or her desire to have counsel present so that a

reasonable police officer under the circumstances would understand the statement to be a

---

custodial interrogation. *Templeton*, 148 Wn.2d at 208.

10

request for an attorney. *Id.* at 214. A defendant does not need to use a special combination of words to make an unequivocal request for an attorney. *Id.* at 215. "[T]he context of an accused's statements to police—including the accused's behavior and the scope of the accused's statements—must be considered in determining whether the accused invoked his or her rights." *Id.* at 216. Where an accused makes an ambiguous or equivocal statement regarding the invocation of his or her rights, law enforcement officers have no obligation to ask clarifying questions or to cease the interrogation. *Id.* at 214.

The proper remedy for violation of the right to counsel under CrR 3.1 is suppression of evidence acquired after the violation. *City of Spokane v. Kruger*, 116 Wn.2d 135, 147, 803 P.2d 305 (1991). However, because the rights provided in CrR 3.1 are not constitutional in nature, the nonconstitutional harmless error test is applied to determine within a reasonable probability whether the verdict would have been the same had the error not been made. *State v. Jaquez*, 105 Wn. App. 699, 716, 20 P.3d 1035 (2001).

In *Kirkpatrick*, the court held that Mr. Kirkpatrick did not waive his CrR 3.1 right to an attorney when he voluntarily answered police questions three hours after requesting an attorney and receiving *Miranda* warnings. *Kirkpatrick*, 89 Wn. App. at 415. The

court found that the police did not provide Mr. Kirkpatrick the right to contact an attorney even though opportunity was available; i.e., the request was made during normal working hours and at a police station, where presumably procedures existed for contacting defense counsel. *Id.* The court acknowledged that a defendant can waive the right to counsel by voluntarily speaking to law enforcement before the earliest opportunity to contact counsel can be provided. *Id.* at 415-16. However, in Mr. Kirkpatrick's situation, the State did not prove that it made a reasonable effort to allow Mr. Kirkpatrick to contact an attorney or that Mr. Kirkpatrick made a valid waiver before the earliest opportunity arose. *Id.* at 416. The court reasoned, "To hold otherwise would allow the State to benefit by its own failure to perform its duty under CrR 3.1(c)(2)." *Id.* at 415-16.

The *Kirkpatrick* court also held that a valid waiver under *Miranda* does not serve the same purpose as a waiver under CrR 3.1. *Id.* at 413. The court found that CrR 3.1 was designed to provide a meaningful opportunity to contact a lawyer, while *Miranda* "is designed to prevent the State from using presumptively coerced and involuntary statements against criminal defendants." *Id.* at 413-14.

Ms. Mulligan repeatedly yelled, "Lawyer! Lawyer!" for two minutes after she hit a police officer and was forcibly detained. The State argues that Ms. Mulligan's request was vague because she could have been sending a veiled message to the arresting officers

that she intended to sue. We need not determine whether her shouts were veiled threats or an exercise of her right to counsel: if the trial court erred in not excluding Ms. Mulligan's statements made in the hospital, we conclude that any error was harmless.

The rights provided in CrR 3.1(c)(2) are not of constitutional origin; thus we apply the nonconstitutional harmless error test. *State v. Greer*, 62 Wn. App. 779, 790 n.4, 815 P.2d 295 (1991). A violation of CrR 3.1 is harmless if there is no reasonable probability that the error materially affected the outcome of the trial. *Templeton*, 148 Wn.2d at 220.

Ms. Mulligan contends that without her admissions at the hospital, there is no evidence that she intended to assault Ms. Kenan and Officer Butts. Considering her level of intoxication, she contends that there is no evidence that she was acting rationally or with any thought about her actions or their consequences.

While it is clear that Ms. Mulligan was intoxicated during the assaults, the evidence of Ms. Mulligan's intent to assault is sufficient, even absent her admissions. We conclude there is no probability that they materially affected the outcome of the trial. During her first assault of Ms. Kenan inside the tavern, Ms. Kenan told Ms. Mulligan not to bang on the window. As Ms. Kenan pulled Ms. Mulligan away from the window, Ms. Kenan told Ms. Mulligan that she was just trying to prevent harm. Still, when released, Ms. Mulligan turned to Ms. Kenan, looked at her, and hit her. Ms. Mulligan's

deliberative pause showed that she intentionally hit Ms. Kenan because she was upset that Ms. Kenan intervened.

Ms. Mulligan's second assault of Ms. Kenan showed a similar intent. Ms. Kenan was attempting to help Ms. Mulligan when Ms. Mulligan stood up, realized it was Ms. Kenan, swore at her, and punched her. Again, Ms. Mulligan showed deliberation just prior to assaulting Ms. Kenan.

Last, Ms. Mulligan's assault of Officer Butts was also an intentional act. When Ms. Mulligan saw Officer Butts approach the other officers and Mr. Mulligan, Ms. Mulligan managed to stand up from the ground, made an angry growling sound, and moved toward Officer Butts. Officer Butts attempted to get out of Ms. Mulligan's way, but she continued to change her direction toward him before punching him. Ms. Mulligan's actions could be viewed as an angry, intentional act against the officer in response to the officer's questioning of her husband. Furthermore, Ms. Mulligan's ability to request an attorney while outside the tavern is evidence that she could make conscious and intentional choices at the time of the assaults.

Thus, even without Ms. Mulligan's statements at the hospital, the jury could infer from the evidence that Ms. Mulligan was aware of her actions when she was committing the assault. There is no reasonable probability that the error materially affected the

14

outcome of the trial. We conclude that even if the trial court erred in not suppressing Ms.

Mulligan's statements at the hospital, the error was harmless.

B.     *Whether self-defense was a jury question on the charge of fourth degree assault of Ms. Kenan inside the bar*

The State bears the burden of proving each and every element of a criminal offense

beyond a reasonable doubt. *State v. Bennett*, 161 Wn.2d 303, 307, 165 P.3d 1241 (2007).

The applicable standard of review is whether, after viewing all the evidence in the light

most favorable to the prosecution, any rational trier of fact could have found the essential

elements of the crime beyond a reasonable doubt. *State v. Joy*, 121 Wn.2d 333, 338, 851

P.2d 654 (1993). A challenge to the sufficiency of the evidence admits the truth of the

State's evidence and any reasonable inferences from it. *State v. Goodman*, 150 Wn.2d

774, 781, 83 P.3d 410 (2004). All reasonable inferences from the evidence must be

drawn in favor of the State and interpreted most strongly against the defendant. *State v.

Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

Circumstantial and direct evidence are considered equally reliable. *State v.

Thomas*, 150 Wn.2d 821, 874, 83 P.3d 970 (2004), *abrogated in part on other grounds by

Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1353, 158 L. Ed. 2d 177 (2004).

"Credibility determinations are for the trier of fact and cannot be reviewed on appeal."

*State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

A defendant asserting a claim of self-defense bears the initial burden of producing some evidence that his or her actions occurred in circumstances amounting to self-defense. *State v. Douglas*, 128 Wn. App. 555, 562, 116 P.3d 1012 (2005). Once this threshold is met and a jury is instructed on self-defense, the State bears the burden of proving the absence of self-defense beyond a reasonable doubt. *State v. Walden*, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997). The absence of self-defense becomes another element of the offense that the State must prove. *State v. Woods*, 138 Wn. App. 191, 198, 156 P.3d 309 (2007).

The jury must assess the self-defense evidence from the perspective of a reasonably prudent person standing in the defendant's shoes, knowing all the defendant knows and seeing all the defendant sees. *State v. Janes*, 121 Wn.2d 220, 238, 850 P.2d 495 (1993). "Courts must inform the jury that the self-defense standard incorporates both objective and subjective elements: the subjective portion requires the jury to stand in the defendant's shoes and consider all the facts and circumstances known to the defendant, while the objective portion requires the jury to determine what a reasonably prudent person similarly situated would do." *Woods*, 138 Wn. App. at 198. The self-defense instructions properly informed the jury, in part, that "[t]he use of force upon or toward the person of another is lawful when used by a person who reasonably believes that he is

16

about to be injured and when the force is not more than is necessary." Clerk's Papers at 72.

Here, drawing all reasonable inferences in favor of the State and most strongly against Ms. Mulligan, sufficient evidence allowed the jury to determine the presence or absence of self-defense. A reasonably prudent person in Ms. Mulligan's position would have known that Ms. Kenan was not attempting to injure her. Ms. Kenan repeatedly asked Ms. Mulligan to stop banging on the window. As Ms. Kenan pulled Ms. Mulligan away from the window, she told Ms. Mulligan, "Stop it; I'm just trying to make sure you don't break the window." 1 RP at 63. Ms. Kenan immediately released Ms. Mulligan as soon as she was away from the window. A reasonably prudent person in Ms. Mulligan's situation would not have seen Ms. Kenan's acts as an attempt to injure. Therefore, a reasonable juror could find from the evidence that Ms. Mulligan did not consider Ms. Kenan's acts an attempt to injure when Ms. Mulligan punched Ms. Kenan. After Ms. Kenan successfully pulled Ms. Mulligan away from the window, Ms. Mulligan turned around, looked Ms. Kenan in the face, and then punched her. Ms. Kenan did not display aggressive behavior and testified that Ms. Mulligan knew whom she was hitting. A reasonable juror could conclude that Ms. Mulligan hit Ms. Kenan because she was angry at her for interfering and not because of a fear of injury. We conclude that the State

17

No. 32998-4-III
*State v. Mulligan*

presented sufficient evidence to allow the jury to determine the presence or absence of self-defense. Affirm.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Lawrence-Berrey, J.

WE CONCUR:

_____
Siddoway, C.J.

_____
Brown, J.

18